META KASPER et al., Appellees, v. ANDREW KASPER et al.,
Appellants.

GIFTS:    Parol Gift of Land—Evidence.    Evidence reviewed, and
held insufficient to establish a parol gift of land with that
degree of clearness required by law.

*Appeal from Jones District Court.*—JOHN T. MOFFIT,
Judge.

NOVEMBER 11, 1919.

REHEARING DENIED JULY 6, 1920.

THE plaintiff brings this action in her own behalf and
in behalf of her minor daughter, to have quieted in her
the title to 240 acres of land.   She claims this in her own
right as widow, and in her daughter's right as heir of one
Rudolph Kasper.   Her claim is that the father and mother
of Rudolph, who are defendants in this suit, gave this land
in controversy to Rudolph, in consideration of his paying
$725 annually during the lifetime of the father.   The dis-
trict court granted her substantially the relief prayed for.
The defendants appeal.    Opinion states the facts.—*Re-
versed on defendants' appeal; affirmed on plaintiffs' appeal.*

*Herrick & Reed, F. F. Dawley,* and *Edwards, Longley,
Ransier & Smith,* for appellants.

*Remley & Remley, J. H. Trewin,* and *J. J. Locher,* for
appellees.

GAYNOR, J.—The plaintiff Meta Kasper is the widow
and Ruth Kasper is the only child of one Rudolph Kasper.

Rudolph was the son of the defendants, Andrew and Kate Kasper. Andrew and Kate are still living. Rudolph died on the 14th day of December, 1915, at the age of 26 years. Andrew Kasper was 51 years of age at the time it is claimed he gave or "bargained" away the land in controversy, and was 56 years of age at the time this suit was commenced. Andrew was the owner of about 600 acres of land, was a farmer, and resided on the lands known in this record as the "home place." He had two children living, Rudolph and Lena. Prior to the happening of the matters hereinafter referred to, he had constructed on this place a large and beautiful dwelling house. Before that, he had occupied a smaller house, immediately adjoining this new one. In 1911, Andrew and his son, Rudolph, who was then married, lived on this home place, Rudolph in the old house, and Andrew, with his wife and daughter, in the new house.

Certain facts appear in this record about which there is no controversy. That we may have a better understanding of the relationship existing between this father and son, at and prior to the time it is claimed the contract relied upon was made, it is well that we mark some of these undisputed facts.

Rudolph was married to the plaintiff Meta when he was about 21 years of age. At that time, he was residing as a member of his father's family, and his father owned all the personal property on the farm. After Rudolph's marriage, in December, 1910, Andrew sold to Rudolph a half interest in the personal property, live stock, etc., on the home farm. The estimated value of this property was $10,000. Andrew took a note for the half interest, signed by Rudolph and Meta. This note was paid,—whether in full or not does not definitely appear; but at least $1,386 was paid thereon. This payment was on March 7, 1911. It appears that some of the personal property had been sold in the meantime, by consent of both parties. Thereafter, Andrew sold to his son his remaining interest in the personal property, and took Rudolph's note therefor in the amount of $3,850; and thereafter, Rudolph was the owner

of all the personal property on the farm. This note may, however, have included a portion of what Rudolph agreed to pay for the first half. After Rudolph became the owner of the half interest in all the personal property on the farm, and had given his note therefor, signed by himself and Meta, he and his father, on the 4th day of March, 1911, entered into a written agreement, by the terms of which Andrew leased to Rudolph all of what is known as the "homestead farm," containing 240 acres, more or less, and all that part of the farm familiarly known as the "Lovell Farm" not heretofore leased to Tjaden. The Lovell farm contained approximately 200 acres. This lease, by its terms, was to commence on the 1st of March, 1911, and to end the 1st of March, 1912. The agreement in the lease was that one half of the proceeds of the farm should go to each: that is, one half of all the crops raised and harvested and not fed out on the farm, and one half of all the increase of stock, and one half of all the proceeds of milk sold. The lease recites: "The intention being that each should have one half the net proceeds of the farm." This lease further recited that each party should furnish one half of the stock upon the farm, and one half the necessary feed, and one half of the seed to be sown upon the farm. It further recited that, should Andrew desire to return to the farm from Monticello, to which place he contemplated moving, before the expiration of the term of the lease, he should have the privilege of doing so; and, in that event, he should have the exclusive use of what is known as the new house. If he did not return, Rudolph should have the right to use the new house.

In the summer of 1911, and after the making of this lease, Andrew and his wife did move to Monticello, leaving the new house vacant. Rudolph continued to occupy the old house until the fall of 1911. It appears that the old folks concluded not to return to the farm, and Rudolph and his wife took possession of the new house. This taking was consistent with the right granted in the lease. It is not disputed that they took possession of the new house some

time in the fall of 1911. While Rudolph and his wife were occupying this farm under this first lease above referred to, and on October 17, 1911, another written lease was entered into between Andrew and his son. This lease was for one year from March 1, 1912, the date when the other lease expired, to March 1, 1913, and it covered the lessor's home farm of 290 acres, at a yearly rental of $725, to be paid as follows: One half December 1st, and one half March 1st. In this lease, it was agreed that Rudolph should pay all road taxes assessed against the farm, and do all the necessary work in keeping the fences in repair during the year 1912, and Andrew should furnish the material therefor; posts for fencing to be cut and hauled by Rudolph from Andrew's timber.

It will be noted that Rudolph continued the occupancy of the (290) acres, and paid $2.50 an acre therefor. The plaintiff is claiming, however, only 240 acres under the oral "bargain" under which she claims now that Rudolph became the owner of 240 acres. Whether Rudolph paid this $725 annually under the lease for the year ending March 1, 1913, and under renewals of this lease for subsequent years, or in pursuance of the claimed "bargain" hereinafter referred to, is a matter of dispute in this record. The claim of the defendants is that, after the making of this last written lease, the same was renewed, from year to year, at an annual rental of $725, with this exception that, after the year 1913, Rudolph should make all repairs and improvements upon the farm at his own cost, and as he willed.

It will be noted that Andrew had but two children; that he was married; that his wife was living; and that he was then but 51 years old. There is no doubt in this record that he intended to give this farm to this son upon his death, and that the nominal rental was made to encourage the son—who was given somewhat to drink—to reform his habits, and to encourage him to keep the farm in repair, and to assure him that improvements made on the farm would be ultimately for his own benefit.

It is the claim of the plaintiff in this suit that, after

this last lease was made, on October 17, 1911, and somewhere between October 17th and the 1st of November, 1911, a new oral *contract* was made between Andrew and his son. She terms it "a new bargain about the place." She says:

"I heard some talk between Rudolph and his father in regard to this new bargain. There was present Rudolph and I and his father and Uncle Tom. (Uncle Tom died before this suit was commenced.) I took no part in the conversation. It was about the 1st of October or the 1st of November, 1911. Rudolph asked his mother for some material, to fix up things he wanted done, and his father said: 'No, my boy, I am not going to fix any more; you can take hold of it and fix it up; you are my only son,—take it and fix it up. It is yours, and, if you pay me $2.50 an acre as long as I live,'—and Uncle Tom said, 'Give the boy something; give him a start; give him something right out, so he knows what he has got,' and Andrew, the father, said: 'No, I can't,—I can't do any better—I can't give it right out—I have to have something out of it as long as I live. I can't do any better,—isn't that reasonable?' Rudolph smiled, and said, 'That is all right.' At the time this conversation took place, Rudolph wanted paint and paper and planks for partitions, and he wanted some woven wire. Up to that time, Rudolph and I had not occupied the new house at all. In September, Andrew offered Rudolph the key to the new house, saying that it didn't look well to see the new house empty, and it might excite comment among the neighbors to see the son living in the old house and the new house empty, and he offered Rudolph the key; but Rudolph refused it. Later, Rudolph got the key."

She claims that this was after the "new, oral bargain" was made. She further testifies that, after Rudolph got the key, they fixed up the new house, and got ready and moved in, and got some additional furniture. That was in the fall of 1911, or early in the winter of 1911,—somewhere about there. She says:

"We just cleaned it up, and varnished the floors, then cleaned the old house up, and painted it all over from top

to bottom on the inside. Certain men came down and did the work. Rudolph paid them."

It is the claim of plaintiff that Rudolph's possession after November 1, 1911, is referable to and in pursuance of this oral bargain,—not to the lease.

It is significant, at least, that, in none of these conversations recited above by the plaintiff, was any reference made to the lease under which Rudolph was then occupying the land, or to the written lease made for the year 1912. There was no provision in the lease of 1911 for the making of improvements by either party. There was a provision in 1912 to the effect that Andrew should furnish materials for repairs. Rudolph then had a most advantageous contract with his father for the year 1912. The record discloses that the rental value of that land at that time was from $6 to $7 an acre. These leases alone would suggest that the father had given the son, as the witnesses testified, "a very good start."

The plaintiff is her only living witness to this contract under which she claims that the title to the 240 acres, a part of the 290 acres included in the lease, passed to her husband; and this is the contract under which she and her daughter are now claiming this 240 acres, as heirs at law of Rudolph. All the rest of her testimony, in so far as it has any probative force, consists of statements claimed to have been made by Andrew subsequently, to the effect that he had given the boy this land, and the further fact that Rudolph made valuable improvements on the farm after November 1, 1911. The fact that the leases hereinbefore set out were made, and that Rudolph was in possession of this land under these leases, and that they created this relation of landlord and tenant between Rudolph and his father, is not disputed. It is the claim of the plaintiffs that, about the 1st of November, 1911, Rudolph became dissatisfied with the arrangements under which he was to farm the land, and that this new arrangement or bargain was the result. No change of possession of the land took place after this alleged

oral contract. The only change in the occupancy of the farm was from the old house to the new house, and it will be noted that this change was provided for in the lease made on March 4, 1911. It will be further noted that the lease commencing on the 1st of March, 1912, covered 290 acres, for which Rudolph was to pay $725, or $2.50 per acre, for the year ending March 1, 1913, and that, under this lease, defendant was to pay for all improvements. The record discloses that the farm was in very good repair at that time; that, so far as repair was concerned, it could need but very little. It is the claim of the defendants that Rudolph occupied the premises during the year 1911 under the written lease heretofore referred to, covering that year; that he occupied the premises during the year 1912 under the second lease; that, in the fall of 1912, and for every succeeding year, this last lease was renewed, except that the father was not thereafter to furnish any of the material for improvements, because of the small rental he was receiving. It will be noted that Rudolph's right to possession under these written leases by their terms did not expire until the 1st day of March, 1913. It is not disputed that he continued the occupancy during 1913, 1914, and 1915, and made some valuable improvements during that time. All permanent improvements were made after the year 1912, and during the years 1913, 1914, and 1915, and were such as made the farm more convenient and useful for the occupant. During all the time of Rudolph's occupancy, and up to the time of his death, Andrew never claimed, and Rudolph never paid to Andrew, more than $725 annually for the use of the premises. Andrew paid all the taxes assessed against these premises during all these years, and insured in his own name all the buildings, and paid for the same.

In January, 1914, Andrew made a will, in which are found the following provisions:

"Subject to the life estate of my wife, I hereby will, devise and bequeath unto my son, Rudolph Kasper, what is known as my home farm in Wayne Township, Jones County, containing 240 acres, being the farm on which he is now

living, and also 20 acres of timber land in Section 27, in Richland Township."

The will further provided that, if the widow, Kate Kasper, desired, and his son Rudolph so desired, she might permit him to use what is known as the home farm, in Wayne Township, referred to in the will, during her life tenancy, at a yearly rental of $725 a year, the taxes to be paid by her, and all repairs and insurance by him.

Plaintiff testified that, some time in the fall of 1913,—but she is not certain of the date; it may have been, and probably was, in the fall of 1914,—she heard some talk between Rudolph and his father, touching the making of some writing in regard to the land. Rudolph said he would like to have something to show that it was his place, and said that, if anything should happen, there would be trouble. The father replied:

"Well, my boy, what do you take your parents for? Do you take them for skinners and thieves? Do you think they would do anything like that, that they could be in their graves and think they could do anything like that?" and Rudolph said that was business, and the father said, "Oh, we will fix it up in Doxey's office."

After this conversation was had, to which the plaintiff testifies, the will above referred to was made, and it was made in Doxey's office and left in Doxey's office. The will would seem to be the natural result of this conversation, assuming that such a conversation ever occurred. It would seem to indicate at least the father's understanding of his obligation to his son touching the land, and this thought would seem to be confirmed by the following testimony given by the plaintiff. She testifies that, after the will was made, the father came to Rudolph's house, with Rudolph's mother. The mother seemed out of humor, laboring under some stress of feeling, and, when she came into the house, she said to the plaintiff's mother:

"Now the boy has his way. He has something to show it is his. It is a shame he couldn't take his parents' word for it. We always took our parents' word for it."

She said they had made a will for it; that it was in Doxey's office; that, if he didn't believe it, he could go and look at it. (Mr. Doxey is an attorney.)

Assuming that this conversation was had between the father and son, touching the making of some paper that would show that he would ultimately be entitled to this property, it is not unreasonable to assume that Rudolph, prompted at least by curiosity,—certainly by self-interest,— would have gone to Doxey's office and examined this will. He lived nearly a year after the will was made. It is not shown that he ever made any complaint of the manner in which his father disposed of the property to him, nor does it appear that he ever afterwards asked his father for any other writing to indicate his father's wishes in the disposition of the land to him; and we assume further, because it is a natural assumption, that, if Meta, the plaintiff, understood, at the time the mother came there and announced the making of the will, that Rudolph already had the property under an oral contract, she would have demurred to this method of disposing of the land to him. It does not appear that she did. Ordinarily, the conduct of people touching property is consistent with their claim of right to the property. If Rudolph understood that his father had given the property to him outright, in the fall of 1911, and if, in his conversation with his father, he had in mind an instrument in writing that would show he had the present title to the land, it would seem not unreasonable to think that he would have at least demurred to some extent to this method of disposing of the land.

While plaintiff rests her case entirely upon this contract or "bargain" to which she has testified, she has sought, through the mouths of many witnesses, to corroborate her story by testimony to the effect that Andrew was heard to say many times, prior to the making of the will, that he had given this land to the boy. A careful analysis of this testimony does not give the probative force which counsel asks for it. As showing the character of the testimony relied

upon, a witness was called by the plaintiff, and was asked this question:

"Did you hear Andy say that it was Rudolph's farm? A. Yes, sir. Well, he told me it was Rudolph's farm when the old man died. Q. Did he say he had given it to Rudolph? A. Yes, sir. Q. Did he say anything about the start he had given the boy? A. Yes. Q. What did he say? A. Well, he had given him a good start to live; said that a good many times. He told me what a nice farm it was. He told me Rudolph had the nicest farm in Wayne Township; that it was as good a farm as any other young fellow had. This was during the years 1913, 1914, and 1915. I was working for Rudolph. Andrew was down to the place many times, and helped with the farming. His father said, a good many times, that he wished Rudolph would stop drinking so much. Rudolph got drunk, and sometimes was arrested for being drunk, and, every time he got drunk, his father and mother would come out and help him. His father would say many times that he wished Rudolph would stop drinking; that he had an awful good chance for a young man; that, if he would leave whisky alone, he would be a good man. His mother said this, too. When the father said he would give the farm to Rudolph, it was always connected with, he wished he would quit drinking whisky. When he said he had given the boy a good start, it was always connected with, if he would stop drinking, it would be an awful good chance. I knew of Rudolph's drinking. He was drunk shortly before he died."

Mrs. Mundinger testified that she heard Andrew say that he had given Rudolph the farm; that he was improving it; that it would be for his own benefit at the last. She testified:

"He did not say anything about payment. One time, I asked Andrew how the boy was getting along on the farm. He said: 'Just fine. He is fixing up everything just fine, and it will be for his own good'. He did not say the boy was paying anything."

She testified that she worked for Andrew's brother,

Thomas; that Andrew visited there quite often; that she heard a conversation between Thomas and Andrew, about the time that Andrew went to Monticello; that Andrew said he was going to give the farm to the boy; that they were going to move off the place, and the boy should fix up the place as well as he could, for his own home.

"I heard a conversation between him and Mr. Barney. Mr. Barney asked him how the boy was getting along, and he said: 'Just fine. He is fixing up the place good. It will be for his own good at last.' He said he had given the boy a better start than most people."

The witnesses, in their testimony, are continually confusing in their speech the word "give" and the word "gave." Sometimes they say that Andrew said he "had given" it to the boy. Again, they say that Andrew said he "would give" it to the boy. This is marked in the testimony of Elizabeth Barney, one of plaintiff's principal witnesses. She testified that, at one time, Andrew said that the home place belonged to the boy; that the boy was supposed to fix the place up, because it was for his own good, and he was to pay $2.50 an acre, as long as Andrew lived. They were talking about what a good start he had given the boy, and that the boy was to get the good out of the improvements. The boy was to put on the improvements for his own good. At another time, she says they were talking about giving the boy a start, and giving him the place, and the improvements he was to put on out of his own money, for his own good. "He would just naturally say what a good start he would give the boy." At another time, she claims that, in a conversation at Rudolph's, when she and others were present,—particularly Lena Kasper and Mr. Beery,—her husband, John Barney, said jokingly to Mr. Beery, "You had better go out of the store and move out on the farm," and Andrew said:

"Oh no, this place belongs to the boy. The place up in the timber there belongs to the girl."

This statement is denied by both Lena and Mr. Beery.

She was cross-examined, and, on re-direct examination, this question was asked:

"In your examination this morning, you answered the question, to wit, 'Go ahead and relate the conversation you had when you were in the carriage on the trip to the farm,' and you answered as follows: 'Well, I cannot say any more. They were just talking about giving the boy a start—just how they would give him the place—the improvements he was to put on the place out of his own money, for it was for his own good.' I now ask you whether you meant that they would give him the place, or whether they had given him the place."

Her answer was, "The word was supposed to be 'given.'"

One Cullup testified that he heard Andrew say, in 1914, that he had given the place to the boy; that the boy was paying $2.50 an acre for it, and keeping it up; that he was paying $2.50 an acre until the old man died.

One Barney, who, the record shows, was on very friendly terms with Rudolph and his wife, and strongly biased in their favor, and who had had trouble with Andrew at one time, over the payment of rent, when occupying Andrew's land, was called. His testimony is to the same effect as the testimony hereinbefore set out, and of the same character, although much more circumstantial. Many of the conversations testified to by Barney are the same as testified to by the other witnesses. Among other things, he said:

"I asked Andrew how the boy was getting along. He said he was getting along fine. This was in 1914. He said he had given him the place, and he was getting $2.50 an acre as long as he lived. I asked him why he didn't give it to him altogether, and he said he ought to have something out of it. He told me that he had put quite a bit of expense on the place."

We have not attempted to set out all this testimony, nor would it be profitable to do so. We have to say that it is of that uncertain and unsatisfactory character which always exists when a witness undertakes to repeat conversa-

tions had with another. It is said to be the most uncertain testimony courts have to deal with, in searching for the ultimate fact. It is uncertain because of recognized human infirmity. It involves a correct understanding of what the party whose speech it is sought to repeat at the time the conversation was had, actually said. There is involved in it the memory of the witness of what is said. It involves a correct repetition of what the memory retains of what was said. It involves the disposition of the witness to be accurate in what he repeats. The changing of a word may convey an entirely different meaning from what the speaker intended to convey. Here we have the witnesses confusing continually the phrase he "had given" with the phrase he "would give." The phrasing of the thought one way tends to corroborate the defendants' theory. The best they can do, and the best they attempt to do, is to give the impression of what was said, couched in their own language. Taking it as a whole, we are left in serious doubt as to what the words were that Andrew used in these conversations with these parties; whether he said he "had given," or whether he said he "would give." The confusion arises from the fact that he had given him a good start. The record discloses that. He had put him on a farm of 290 acres, which was well improved, and had given him $10,000 worth of personal property, taking his note only therefor. Andrew might well and truthfully have used the words, "I have given him a good start." The witnesses, in their recollection of what he said, may well, and we think have, confused what Andrew said touching the start he had given the boy, and what he said touching the giving of the land. Indeed, a careful analysis of the testimony, with the exception, perhaps, of one witness or two, leaves the mind impressed with the thought that Andrew never intended to convey, by what he said, the thought that he had actually passed the title to Rudolph. The relationship existing between them at the time it is claimed this contract was made, what was then said, what was done afterwards, as shown by the undisputed record, negative the idea that he ever did, in fact,

intend to give, or that Rudolph ever conceived the idea that he had given him, the title to this property. He was Andrew's only boy. No doubt, with all his faults, Andrew loved him still. Andrew was anxious to see him get ahead in the world. He was doing the best he could to give him a start in the world; but, as disclosed by the record, Rudolph was not making the best of his opportunity. When Rudolph asked for some writing to evidence that he would ultimately have the property, the father made the will; and, after Rudolph died, and the estate was called for administration, his wife, Meta, who is now claiming this property under an oral contract, made away back in 1911, made no claim to this property as the widow of Rudolph, but surrendered possession to Andrew, without questioning Andrew's right to the possession. Her conduct is wholly inconsistent with the claim that she now urges, and we say that what she has offered to corroborate her in her claim is insufficient for that purpose. The burden rests on the plaintiff, and she must prove her claim by clear and satisfactory evidence.

We need not give all the testimony of the defendants, although the defendants' testimony tends strongly to negative the claims that she makes. We think that, on her own testimony, she has failed to make out her claim by that character of evidence which the law requires. The payment of this $725 a year is the only evidence of any payment made by Rudolph under this oral contract under which the plaintiff seeks title to this land, and this payment is more consistent with the obligation expressed in the lease than it is with the claim made by her in this suit. ' She is claiming that Rudolph received, in this bargain of sale, only 240 acres. The record shows that, during all these years, he has occupied the 290 acres, the number of acres the use of which was granted him in his lease. The amount he has paid is the exact amount of 290 acres at $2.50 an acre. This circumstance strongly negatives her claim.

As said in *Schields v. Horbach,* 49 Neb. 262, 270 (68 N. W. 524):

"It is a well-established rule that, where one is in possession as tenant at the time he contracts for the purchase of the demised premises, his subsequent possession will be presumed to be under the lease, unless it be clearly shown to result from the subsequent agreement."

See, also, *Casady v. Casady*, 184 Iowa 1241, in which it is said that:

"The burden was, therefore, upon the plaintiff to rebut the presumption that possession, admitted to have been originally subject to the title and ownership of the father, ever became otherwise by perfected gift *inter vivos*."

In our judgment, the record bristles with the thought that whatever improvements Rudolph put on the farm were made in anticipation of ultimate ownership, but not in a reliance upon present ownership. The law that governs this case has been well settled. We need not refer to the authorities. It is simply a fact question, and we resolve it against the contention of plaintiffs. We think the court erred in granting plaintiffs the relief it did, and its judgment is, therefore, reversed.—*Reversed on defendants' appeal; affirmed on plaintiffs' appeal.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.